# IN THE COURT OF APPEALS OF IOWA

No. 23-1611
Filed October 30, 2024

**MICHAEL BELZ, individually and as Executor of the Estate of GERALD M. BELZ, and SHERINE BELZ, individually,**
    Plaintiffs-Appellants,

**vs.**

**STATE OF IOWA**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Johnson County, Elizabeth Dupuich, Judge.

Plaintiffs appeal the district court's order striking a report of their expert, granting summary judgment, and dismissing their wrongful-death action against the State. **AFFIRMED.**

Dominic Pechota of Trial Lawyers for Justice, P.C., Decorah, for appellants.

Brenna Bird, Attorney General, Eric Wessan, Solicitor General, Adam Kenworthy, Assistant Attorney General, and Alexa S. Den Herder (until withdrawal), Assistant Solicitor General for appellee State.

Heard by Tabor, C.J., Ahlers, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**AHLERS, Judge.**

Gerald Belz, a freshman at the University of Iowa, died from exposure to severely cold weather after leaving his residence hall late at night without his key card and adequate clothing. His mother, individually, and his father, individually and as executor of his estate, brought a wrongful-death and loss-of-consortium action against the State. They claim the state-owned university was negligent in unexpectedly locking a door to Gerald's residence hall without notice and such negligence caused Gerald's death. The district court granted summary judgment to the State based on discretionary-function immunity and struck a report submitted by the parents' expert as untimely. The parents appeal.

I.      **Factual and Procedural Background**

In late January 2019, Iowa City experienced a polar vortex, which brought extremely cold temperatures and strong winds to the area. The University of Iowa canceled classes from January 29 at 5:00 p.m. through January 31 at 12:00 p.m., but the university remained otherwise operational.

To prepare university facilities for the extreme weather, facilities and maintenance staff monitored the various buildings on campus. Staff discovered that a sprinkler head in the east/main vestibule of Burge Hall was at risk of freezing due to the cold temperatures. The vestibule is formed by two sets of doors—an exterior set and an interior set. Typically, the inner set of doors to the east entrance locked at 10:00 p.m., requiring residents of Burge Hall to use their campus identification card to enter the building, while the outer doors remained unlocked such that people could access the vestibule space. To prevent the sprinkler head from freezing, which could trigger the fire alarm and result in all residents

evacuating the building into the severe weather, staff propped open the inner set of doors so that heated air from the building would warm the vestibule and prevent any freezing. Because the inner doors were propped open, staff then locked the outer set of doors at 10:00 p.m. to secure the residence hall. However, residents were still able to gain entry to the building through the outer doors by using their identification cards. Residents could also use their identification cards to access entrances on the other three sides of the building.

On the night of January 29, Gerald drank alcohol and vaped THC in Burge Hall, where he and his roommate lived. Gerald became sick. At 1:09 a.m. on January 30, Gerald, underdressed for the weather, went outside Burge Hall's west door.[1] He did not have his identification card with him, as he had left it in his wallet in his room. As shown on security-camera footage, Gerald fell over and was motionless. Roughly an hour and forty minutes later, university police found him in an alleyway between the memorial union parking ramp and Halsey Hall. Gerald was transported to the hospital where he was declared dead from hypothermia.

Gerald's parents, individually and as executor of his estate, brought this action against the State and the university claiming wrongful-death and loss of consortium. They contend that the university was negligent for locking the exterior doors to the east entrance of Burge Hall on the evening of January 29.

The State moved for summary judgment. It claimed discretionary-function immunity and contended that the Belzes failed to establish a genuine issue of material fact as to causation with respect to whether Gerald ever attempted to use

---

[1] This was captured on security-camera footage.

the locked exterior doors at the east entrance of Burge Hall. The State also moved to strike a supplemental report from the Belzes' expert. The district court granted the motion to strike the supplemental report, agreed the State was entitled to discretionary-function immunity, and granted the State's motion for summary judgment.[2]

The Belzes appeal.

## II.    Scope and Standard of Review

Our review of a grant of summary judgment is for correction of errors at law. *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007). "Summary judgment is appropriate only when the entire record demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.*; Iowa R. Civ. P. 1.981(3). Material facts are those that affect the outcome of the suit, and a fact issue "is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *In re Est. of Franken*, 944 N.W.2d 853, 858 (Iowa 2020) (cleaned up). "The record on summary judgment includes the pleadings, depositions, affidavits, and exhibits presented." *Stevens*, 728 N.W.2d at 827. We review the record in the light most favorable to the nonmoving party and make on their behalf all "legitimate inference[s] that can be reasonably deduced from the record." *Homeland Energy Sols., LLC v.*

---

[2] The district court noted it was likely it would have found that the Belzes failed to generate a fact question as to whether Gerald tried to use the east entrance the night he died. However, the court did not make a definitive ruling on this issue, finding it unnecessary in light of its ruling dismissing the claims on the discretionary-function-immunity ground.

*Retterath*, 938 N.W.2d 664, 683 (Iowa 2020) (quoting *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717–18 (Iowa 2001)).

## III.    Discussion

On appeal, the Belzes argue that the district court erred in applying discretionary-function immunity to this tort action.[3]  In doing so, the Belzes seek refinement of the discretionary-function-immunity test.   However, we need not address discretionary-function immunity in this appeal.   Instead, finding a fundamental flaw in the Belzes' underlying substantive claims, we elect to address an alternative basis to affirm the district court—lack of causation.  *See Rivera v. Clear Channel Outdoor, LLC*, 7 N.W.3d 734, 739 (Iowa 2024) (recognizing that an appellate court "may still affirm if there is an alternative ground, raised in the district court and urged on appeal, that can support the court's decision" (citation omitted)).

Causation has two components: factual cause and scope of liability.  *State v. Roache*, 920 N.W.2d 93, 101 (Iowa 2018).  Factual causation is evaluated using

---

[3] Prior to the passage of the Iowa Tort Claims Act (ITCA), "tort suits could not be brought against the state because such suits were prohibited by the doctrine of sovereign immunity." *Wagner v. State*, 952 N.W.2d 843, 856 (Iowa 2020) (citation omitted).  Following passage of the ITCA, the State may be liable in tort "only in the manner and to the extent to which consent has been given by the legislature." *Id.* (citation omitted).  "By enacting the ITCA, the State waived this immunity and opened itself to suit, but it did so strictly on its terms.  Simply stated, the ITCA sets the metes and bounds of the State's liability in tort." *Id.* at 857 (cleaned up).

Discretionary-function immunity is an exception to the state's waiver of its sovereign immunity.  *See* Iowa Code § 669.14(1).  Under this exception, "[t]he State does not waive its sovereign immunity for actions 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion be abused.'" *Anderson v. State*, 692 N.W.2d 360, 364 (Iowa 2005) (quoting Iowa Code § 669.14(1)).

the "but-for" test:

> The defendant's conduct is a cause in fact of the plaintiff's harm if, but-for the defendant's conduct, that harm would not have occurred. The but-for test also implies a negative. If the plaintiff would have suffered the same harm had the defendant not acted negligently, the defendant's conduct is not a cause in fact of the harm.

*Id.* (cleaned up).

The Belzes concede that, to generate a jury question with respect to factual causation that would avoid summary judgment, they must present some evidence that Gerald attempted to access the east entry vestibule of Burge Hall the night he died. This is because if Gerald didn't try to access the east doors, then the locking of those doors caused no harm to Gerald. The Belzes contend they have presented sufficient evidence to generate a jury question on Gerald's attempt to access the east doors. They contend a jury could infer he would try to access the east vestibule after he failed to gain entry through the west entrance because doing so was a reasonable course of action given that the east vestibule had an emergency access phone that could be used by those who forgot their university identification cards to call the front desk. They also point to the lack of security footage showing Gerald not attempting to access the east vestibule.[4] They also reason that, because police found Gerald by another university building, a jury could conclude he had been walking around campus trying to find an unlocked door after first trying to access the east vestibule door. While we view the facts in the light most favorable to the Belzes as the non-moving party, the theories asserted by the Belzes are no more than speculation unsupported by any record

---

[4] To be clear, there is no security footage showing Gerald at the east vestibule of Burge Hall the night he died.

evidence. *See Hlubek v. Pelecky*, 701 N.W.2d 93, 96 (Iowa 2005). And "[s]peculation is not sufficient to generate a genuine issue of fact." *Id.* The Belzes simply presented no evidence that Gerald attempted to gain access to the east doors of Burge Hall.

Faced with the lack of record evidence supporting their contention that Gerald tried to gain entry at the east doors, the Belzes ask us to expand the record. They ask us to consider a report relating to cell phone data produced by their expert, which they claim shows Gerald's phone in the vicinity of the east vestibule. They contend this is evidence Gerald attempted to access the east doors. The report is not part of the record supporting the Belzes' contention that they have generated a fact question on causation because the district court struck that report as untimely. The Belzes contend that the district court abused its discretion when it did so. *See Hagenow v. Schmidt*, 842 N.W.2d 661, 669 (Iowa 2014) ("We review for abuse of discretion discovery rulings on whether to exclude evidence as a sanction for untimely disclosure."), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016).

The Belzes were required to certify their expert witnesses and provide expert reports on or before February 9, 2023, and did so. But they submitted a second expert report as part of a supplemental discovery response that they characterized as a "supplemental" expert report dated May 26 and provided by the Belzes on June 1—well past the February 9 deadline. It was this "supplemental" report that included the cell phone data the Belzes seek to use in support of their claim that they have generated a fact question on Gerald's attempt to access the east doors. But the State moved to strike the report from the record because the

Belzes provided the report after the February 9 deadline and it discussed different topics than the expert's initial report. We agree with the State that the second expert report, which discussed geolocation data extracted from Gerald's cell phone, is not a supplemental report to the expert's initial report, which discussed health data extracted from Gerald's cell phone. *Cf.* Iowa R. Civ. P. 1.508(3) (explaining that supplemental reports should supplement the expert's report and characterizing it as "additions or changes" to the original report). As the second report is not a supplemental report, the Belzes were required to provide the State with the second report before the February 9 deadline. *See* Iowa R.s Civ. P. 1.500(2)(d), (e), .508(3). And the State was justified in moving to strike the second report as untimely. *See* Iowa R. Civ. P. 1.517(2)(b)(3).

Still, striking the report "is an extreme sanction" that is justified only when the report would be prejudicial. *Cf. Hagenow*, 842 N.W.2d at 672. To evaluate whether to strike the report, the court considers:

> 1. the parties' reasons for not providing the challenged evidence during discovery;
> 2. the importance of the evidence;
> 3. the time needed for the other side to prepare to meet the evidence; and
> 4. the propriety of granting a continuance.

*Id.* (citation omitted). The district court considered these factors and struck the second report. In doing so, the court concluded that the report provided little insight because it was not reliable standing alone, noting that the report concedes that the phone extraction data should be considered with "other corroborating evidence" and "reliable extrinsic or circumstantial evidence regarding how the phone was held, by whom, and under what circumstances." The court also noted that the

underlying extraction data had been available to the Belzes for more than a year prior to the expert report deadline, and the Belzes had previously conceded that they were not going to present evidence regarding geolocation information from Gerald's cell phone.[5]  These were permissible considerations for the court to rely upon to strike the second report.  The Belzes have failed to establish that the district court abused its discretion when striking the second report.  *Cf. Garrison v. New Fashion Pork LLP*, No. 18-CV-3073-CJW-MAR, 2020 WL 1318806, at *3–8 (N.D. Iowa Jan. 23, 2020) (applying similar federal rules of civil procedure and concluding an untimely second expert report is not a supplemental report and must be stricken).

Because the court did not abuse its discretion when striking the second report, it is not in our record and the Belzes cannot rely on the report to generate a fact question with respect to factual causation.  As a result, the record contains no evidence to create a question of material fact regarding whether Gerald attempted to access the east vestibule entrance of Burge Hall the night he died.

---

[5] Prior to the late disclosure of the expert's report, the expert was deposed.  During the deposition, when the scope of the expert's testimony was questioned, the Belzes' counsel stated:

> Just so you understand.  It's—there was a bunch of geolocation data too, like when it hits Wi-Fi, kind of like the stuff we got from you guys, which note it hits.
>
> We asked [the expert], well, from looking at the phone, can you get us even better locations as to where he was?
>
> And there was stuff showing [Gerald] walking around Burge Hall, because the problem is it also shows he was at places, like, across the river that we know is not accurate; and so since he couldn't tell us, you know, reliably:
>
> "Yes, absolutely, I know this is where he was."
>
> We said: "Then don't contain it in the report because we're not going to be asking you any questions about it."

Accordingly, the Belzes cannot establish that had the university not locked the exterior vestibule door to the east entrance of Burge Hall, Gerald would not have died. So, they cannot establish the factual-causation component of causation. *See Roache*, 920 N.W.2d at 101.

We affirm the district court's grant of summary judgment on this alternative ground.

**AFFIRMED.**